## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA JOHNSON, | CASE NO. 1:13-cv-02137-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 10, 11, 12, 13 |

### I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Debra Johnson for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff was forty-five years old on August 17, 2010, the date of her application. She alleged disability as a result of her mental impairments, primarily depression, generalized anxiety disorder ("GAD") and PTSD. Plaintiff stopped working in 2009 because she was fleeing domestic violence, not because of her impairments. Plaintiff did not apply for SSI until she enrolled in the state-run Maximizing Participation Project ("MPP"), which required her to file for SSI. When her application was denied, MPP required her to file an appeal. If she did not follow-through with her application and appeal, she would have lost her eligibility for the MPP services. From 2008 through the date of the ALJ's decision, Plaintiff received only outpatient counseling and medication. Treatment notes from 2008 consistently indicated she was making "good" progress and she improved in all of her treatment goals from 2010 to 2011. Although she indicated that she experienced debilitating anxiety and depression on an almost-

daily basis, she had improved with treatment by May of 2011 to the point that she had depression on only three days per week and anxiety on two days per week. None of Plaintiff's treating physicians opined that she had functional limitations or was unable to work.

Plaintiff asserts that the ALJ erred in failing to find that she met the requirements for Listing 12.04. However, in order to meet Listing 12.04, Plaintiff would have to meet either the "Paragraph B" or "Paragraph C" criteria. Plaintiff does not even allege that she meets either of those criteria, and substantial record evidence, including an opinion by a state agency physician, supports the ALJ's determination that she did not satisfy them. Thus, substantial evidence supports the ALJ's Listing analysis.

Plaintiff also asserts that the ALJ erred in evaluating her credibility, rendering his RFC assessment flawed. However, the ALJ based his credibility determination on Plaintiff's treatment record, which showed improvement and conservative treatment. Plaintiff does not directly challenge these rationales. Moreover, Plaintiff does not specifically identify any additional functional limitations the ALJ should have included, other than asserting she is entirely unable to work. Plaintiff further asserts that the ALJ erred in evaluating her credibility because he did not properly account for the side effects of her medication, but the only evidence of these side effects were her subjective complaints, which were properly discounted. Regardless, although Plaintiff identifies her claimed side effects, she does not identify any additional functional limitations that stem from them.

The ALJ's conclusion that Plaintiff's treatment record contradicted her subjective symptoms was accurate and is a proper basis for rejecting her credibility. Plaintiff does not directly challenge the ALJ's rationale for rejecting her credibility, and does not proffer another legitimate reason for rejecting the ALJ's conclusion. Consequently, substantial evidence also

supports the ALJ's RFC assessment. The Court will affirm the decision of the Commissioner and deny Plaintiff's appeal.

## II.      Procedural Background

On September 1, 2010, Plaintiff filed an application for SSI under Title XVI of the Act. (Tr. 84-90). On October 27, 2010, the Bureau of Disability Determination denied this application and Plaintiff filed a request for a hearing. (Tr. 47-48, 65-69). On October 12, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 7-28).  On November 29, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 49-64). On January 27, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 6), which the Appeals Council denied on July 13, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 12, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 14, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On December 27, 2013, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 12). On January 30, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on July 3, 2014, and an order referring the case to the undersigned for adjudication was entered on July 7, 2014. (Doc. 16, 17).

## III.      Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of Social Sec., 529 F.3d 198,

200 (3d Cir. 2008); <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence

is a deferential standard of review. <u>See</u> <u>Jones v. Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004).

Substantial evidence "does not mean a large or considerable amount of evidence." <u>Pierce v.</u>

<u>Underwood</u>, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere

scintilla" of evidence, <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than

a preponderance. <u>Jones</u>, 364 F.3d at 503. If a "reasonable mind might accept the relevant

evidence as adequate" to support a conclusion reached by the Commissioner, then the

Commissioner's determination is supported by substantial evidence. <u>Monsour Med. Ctr. v.</u>

<u>Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir.

1999); <u>Johnson</u>, 529 F.3d at 200.

### IV.     Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits

show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible

for disability benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>see also</u> <u>Plummer</u>, 186 F.3d at 428. If the

Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on July 27, 1965 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 84). She has a limited education and past relevant work as a factory worker and a housekeeper. (Tr. 23-24). Plaintiff was treated for osteoarthritis, leg pain, neck pain, back pain and obesity on during the relevant period, but has not challenged the ALJ's determinations regarding her physical impairments. (Tr. 299-302).

Plaintiff was also treated for mental health impairments. Plaintiff was hospitalized from September 29, 2005 to October 25, 2005 for depression and cocaine dependence. (Tr. 250). She successfully completed the program and was discharged to Evergreen Halfway House. (Tr. 250). Plaintiff was treated from April 10, 2006 to August 10, 2006 at Berks Counseling Center for depression, mood swings, sleeping problems, anxiety, and fear of the dark. (Tr. 221-40, 270-97). She was working forty hours a week packing cell phones. (Tr. 222). Plaintiff was discharged because she stopped showing up for appointments when she could not find a baby sitter after her daughter was returned to her. (Tr. 224).

On March 12, 2008, Plaintiff was evaluated at Pennsylvania Counseling Services ("PCS"). (Tr. 330). She had been depressed since February and put herself into counseling. (Tr. 309). She had been living at the YMCA for the past two years with her two children. (Tr. 309). She reported that she was tired all the time, had no appetite, and could not sleep. (Tr. 330). Her social environment was supportive and she reported good relationships with all of her family members. (Tr. 331). Her appearance was appropriate, her behavioral presentation was cooperative, her speech was normal and coherent, her thought process was clear and coherent, her range of affect was normal, her thought content was non-psychotic, her eye contact was good, she was alert, her movement and concentration were appropriate, her impulse control, judgment, and fund of knowledge were good, and she had no memory difficulties. (Tr. 34). However, her affect was agitated, her mood was irritable, and her level of distress was high. (Tr. 334). She was diagnosed with GAD and assessed a GAF of 44. (Tr. 335).

On March 17, 2008, Plaintiff followed up at PCS. (Tr. 329). She was "beginning to respond to treatment." (Tr. 329). Her progress was "good" and her capacity to respond and benefit from therapy was "very good." (Tr. 329). On April 2, 2008, Plaintiff followed-up. (Tr.

328). She was frustrated with her current housing situation, but her progress was "good" and her capacity to respond and benefit from therapy was "very good." (Tr. 328).   On April 11, 2008, Plaintiff followed-up. (Tr. 326). She presented with anger and anxiety. (Tr. 326). Her progress was "moderate" and her capacity to respond and benefit from therapy was "good." (Tr. 326). On April 17, 2008, Plaintiff followed-up and presented with anger and anxiety. (Tr. 325). She was anxious about her upcoming discharge from the YMCA program. (Tr. 325). Her progress was "good" and her capacity to respond and benefit from therapy was "very good." (Tr. 325).   On April 24, 2008, Plaintiff followed-up. (Tr. 324). She was "confronting issues from the past and struggling with that." (Tr. 325). (Tr. 324). Her therapist noted that she was "on the road to recovery." (Tr. 324). Her progress was "good" and her capacity to respond and benefit from therapy was "excellent." (Id.).

On May 16, 2008, Plaintiff was evaluated by Dr. Hoda Hanna, M.D., at PCS. (Tr. 310). She was cooperative, verbal, and communicative. (Tr. 310). She "definitely seemed depressed in her mood and sad in her affect, but she was appropriate." (Tr. 310). There was "no evidence of disturbing thoughts," she was relevant and coherent in her conversation, with no pressured speech, looseness of association or flight of ideas. (Tr. 310). "Cognitively she seemed intact." (Tr. 310).   Her personality traits were "difficult to elicit although she does show a lot of emotional neediness and dependence, but she is showing a lot of insight into her own difficulty, just inadequate confidence and self-esteem." (Tr. 310). He diagnosed her with depression, alcohol and cocaine dependence in remission since 2005, and dependent personality. (Tr. 310). He assessed her to have a GAF of 50. (Tr. 310). He started her on Celexa and Trilafon. (Tr. 310).

On June 19, 2008, Plaintiff followed-up at PCS and presented with anxiety. (Tr. 322). She reported that she was soon to leave the YMCA. (Tr. 322). She indicated that her daughter

"running the streets." (Tr. 322). Her therapist spoke to her about attendance and missed appointments. (Tr. 322). Her progress was "good" and her capacity to respond and benefit from therapy was "good." (Id.).   On June 26, 2008, Plaintiff followed-up. (Tr. 321). She presented with anxiety and appeared "stressed because of her daughter's defiance and her living situation." (Tr. 321). Her progress was "moderate" and her capacity to respond and benefit from therapy was "good." (Id.).   On August 4, 2008, Plaintiff followed-up at PCS and presented with depression. (Tr. 319). She was working and moving into her own apartment, which caused her a fair amount of stress. (Tr. 319). Her progress was "good" and her capacity to respond and benefit from therapy was "good." (Id.).

On September 24, 2008, Plaintiff followed-up at PCS and presented with anger and frustration. (Tr. 318). She also reported feeling sadness and frustration. (Id.). Her progress was "good" and her capacity to respond and benefit from therapy was "good." (Id.).   Plaintiff followed-up on October 24, 2008. (Tr. 315). She presented with anxiety and frustration. (Tr. 315). She reported concerns with a "very contagious matter" being swept under the rug, jeopardizing people's health. (Tr. 315). Her progress was "good" and her capacity to respond and benefit from therapy was "good." (Id.).   On November 13, 2008, Plaintiff followed-up at PCS. (Tr. 314). She showed feelings of anxiety as she was trying to make it on her own and was not getting enough work at her job. (Tr. 314). Her progress was "moderate" and her capacity to respond and benefit from therapy was "good." (Id.).

Plaintiff did not show up for her next two appointments, and PCS was unable to contact her, so she was discharged. (Tr. 311-13). Plaintiff would later explain that she had fled to Berks Women in Crisis Domestic Violence Shelter to flee her abusive ex-boyfriend with her children

and was essentially living in hiding. (Tr. 191).   Her discharge summary indicated that Plaintiff was "doing well with her treatment, anger seemed to decrease." (Tr. 311).

About sixteen months later, on May 17, 2010, Plaintiff had an outpatient intake evaluation at Child and Family Support Services, Inc. ("CFSS") (Tr. 168). She indicated a history of physical and emotional abuse, and had been referred from "SWIC," or Schuylkill Women in Crisis. (Tr. 168).  She reported that she had been clean for seven years, had stopped substance abuse counseling two years earlier, and lived with her two adolescent children. (Tr. 169). She reported feeling depressed all the time, tired, and crying, but had no suicide or homicide ideation or substance abuse. (Tr. 168).  She reported that she had no interest in leisure activities. (Tr. 171). She reported that she was not taking medication. (Tr. 171). Under strengths, her therapists indicated "insight into illness, articulate, compliant with treatment, and compliant with medication." (Tr. 172). Her symptoms included ruminative worrying since moving in November, labile/flat/blunt mood, racing mind, depressed mood, panic attacks, phobias, PTSD symptoms, low self esteem, overcritical/dislike self, avoidant/withdrawn, sleep disturbance, low energy, and headaches all the time. (Tr. 172). Her posture was "defeated" and her motor behavior was restless. (Tr. 173). Her speech quantity was "minimally responsive." (Tr. 173). Her thought process was distracted. (Tr. 173). She was "very depressed, tearful throughout." (Tr. 173). However, her comprehension, judgment, memory and conception were not impaired. (Tr. 172). She did not have impulse control problems. (Tr. 172).  She was diagnosed with Major Depression and PTSD. Her recommended treatment was outpatient, with a medication evaluation. (Tr. 175).

On May 21, 2010, Plaintiff discussed her depression at her counseling session at CFSS. (Tr. 191). She reported feeling sad all the time and that she had not been able to adjust to the

move to SWIC from the Berks Women in Crisis Domestic Violence Shelter. (Tr. 191). She reported that she could not find a job housekeeping, but would utilize other strategies, such as the want ads and hospitals. (Tr. 191). She again addressed depression in her June 9, 2010 counseling session and continued to have periods of deep depression and crying. (Tr. 190). She was "mourning the end of her ten year relationship with an abusive partner and the loss of her home in Reading." (Tr. 190). She had a family reunion that weekend to look forward to. (Tr. 190). On July 1, 2010, she was very depressed and tearful talking about her past and current situations. (Tr. 189). On July 7, 2010, Plaintiff addressed depression and insomnia at her counseling session at CFSS. (Tr. 188). She reported she had not slept the night before. (Tr. 188).

On July 13, 2010, Plaintiff reported frustration with the EARN program that the welfare department put her into, but her therapist encouraged her to continue with the program. (Tr. 187). On July 22, 2010, Plaintiff was again frustrated with the EARN program, and her therapist indicated that she had "seen a regression in Debra since she started the program." (Tr. 186). The same day, her therapist contacted the SWIC program about Plaintiff's progress and programs, but the SWIC therapist would not give any information until Plaintiff signed a medical authorization. (Tr. 185). She also spoke with Plaintiff's case manager with the EARN program about getting her out because it was mentally "harmful." (Tr. 185).

On July 28, 2010, Plaintiff "presented with a smile on her face" to her counseling session at CFSS. (Tr. 184). She "sat down and immediately discussed positives" and was "excited to tell therapist that she cooked dinner for her children last week." (Tr. 184). "She also was excited to tell therapist that she took her daughter shopping." (Tr. 184).

On August 4, 2010, Plaintiff represented in a "bad mood" and reported she had a bad weekend. (Tr. 183). She discussed how she got so angry at the EARN program that the people

there made her to go a different area.  (Tr. 183).  However, she also reported that she took her son shopping after the last counseling session, which made her feel good. (Tr. 183).

On August 12, 2010, Plaintiff presented in a "great mood" at her counseling session at CFSS. (Tr. 182). She got out of the EARN program, and she felt that was a "monkey lifted off of her back." (Tr. 182). Her children had spent the entire previous night in her room, and they commented on what a difference it made and that she was not yelling anymore. (Tr. 182). She also opened up about the physical and mental abuse she had endured in the past and observed that it had affected her children. (Tr. 182).

The same day, Plaintiff completed a Maximizing Participation Project ("MPP") service plan. (Tr. 149). She was required to comply with the service plan in order to remain out of the EARN program. (Tr. 149). One of the requirements identified on August 12, 2010 was to "follow through with social security application." (Tr. 151). When her service plan was updated on May 20, 2011, one of the things she was required to do was "follow through with SSI appeal." (Tr. 155).

On August 16, 2010, Plaintiff had a psychiatric evaluation with Dr. Jopinder Pal Harika, M.D., at CFSS. (Tr. 195). Dr. Harika observed that she "fidgets with her hands and feet, is unable to remain seated, blurts out answers, difficulty awaiting her turn, interrupts others, loses things, and is distracted by extraneous stimuli." (Tr. 194). She was alert and oriented with coherent and logical speech, organized thought processes, normal average intellect, and fair insight and judgment. (Tr. 194).  He prescribed her Ritalin, Lamictal, and Celexa. (Tr. 195). He diagnosed her on with PTSD, ADHD, Panic Disorder with agoraphobia, bipolar disorder, history of cocaine dependence, Personality Disorder not otherwise specified with dependent and avoidant features, and assessed her to have a GAF of 40. (Tr. 194).

On September 3, 2010, Plaintiff discussed anxiety and insomnia at her counseling session at CFSS. (Tr. 181). She presented in a good mood, but had some concerns about her medication. (Tr.181). She was "feeling better" but not sleeping and could not "shut her brain off." (Tr. 181).

On September 10, 2010, Plaintiff's treatment plan was updated. Her anxiety goal was to decrease the days on which she felt anxious from four days a week to two days a week. (Tr. 176). Plaintiff had "improved" in this goal, and specifically "expressed her anxiety improved." (Tr. 176). Plaintiff's depression goal was to decrease the days on which she felt depressed from four times per week to two times per week. (Tr. 176). There was no change, and Plaintiff indicated that her depression "changes from week to week." (Tr. 176). There was "no change" in her involvement in social activities. (Tr. 176). She was assessed a GAF of 40. (Tr. 176).

On September 21, 2010, Plaintiff addressed anxiety and depression at her counseling session at CFSS. (Tr. 179). She had very high anxiety after an incident with bed bugs and did not sleep for two nights. (Tr. 179). However, she was eventually able to relax. (Tr. 179). She indicated that her daughter's father had died in jail, and that she and her daughter were "doing ok with that." (Tr. 179).  On September 28, 2010, Plaintiff addressed anxiety, focus, and attention at her counseling session at CFSS. (Tr. 178). She presented as "much better." (Tr. 178).

On September 22, 2010, Plaintiff completed a Function Report. (Tr. 95). She indicated that she had "no problem" with her personal care. (Tr. 95). She reported that she cares for her children by getting them up for school every day, cooking for them, washing their clothes, and taking them to doctor's appointments. (Tr. 95). She reported that she suffers from insomnia. (Tr. 95). She reported that she can cook complete meals for several hours every day. (Tr. 96). She reported that she cleans, does laundry, irons, and does dishes regularly. (Tr. 96). She indicated that she does not drive, but could go out alone. (Tr. 97). She reported that she shops in stores

twice a month for one to two hours for groceries, toiletries, clothes, and necessities, but also reported that she never goes outside except for appointments. (Tr. 97). She reported that her hobbies include watching TV and reading books, but that it is hard for her to concentrate while reading. (Tr. 97). She testified that she spends time with others by talking on the phone with her family three times per week and going to counseling sessions for domestic violence and mental health problems. (Tr. 98). She reported that she does not have a problem getting along with family friends, or neighbors, but she also wrote that she does not "like to be around people too long" because she "starts feeling overwhelmed or anxious to be back in [her] comfort space which is home." (Tr. 99). She wrote that she follows instructions well and indicated that her impairments do not affect her ability to follow instructions. (Tr. 99). She indicated she had no problem getting along with others, understanding or memory. (Tr. 99). She reported that she had never been fired from a job. (Tr. 100). She reported that she did not handle stress or changes in routine well. (Tr. 100). When Plaintiff filled out her undated disability appeals report, however, she indicated that she no longer bathes, stays in bed for long periods of time, and does not feel like cooking for her children. (Tr. 144). She indicated her symptoms had worsened in September of 2010. (Tr. 144).

On September 28, 2010, Plaintiff's mother, Janet Shields, completed a Third Party Function Report. (Tr. 128). She indicated that Plaintiff lives in Pennsylvania, but she lives in Florida, so they do not see each other. (Tr. 128). She indicated that, for the most part, she did not know the answers to the questions asked on the report, although she did indicate that Plaintiff cooks each day and has always taken care of her home. (Tr. 130). She indicated that she talks to Plaintiff about three times per week. (Tr. 132).

On October 27, 2010, Dr. Michael Suminski, M.D., a non-examining state agency physician, completed mental RFC and PRTF assessments. (Tr. 203). He opined that she was moderately limited in her ability to understand, remember, and carry out detailed instructions, but had no limitation for simple instructions.  (Tr. 203). He opined that she was moderately limited in her ability to interact appropriately with the general public and to respond appropriately to changes in a work setting, but that she had no other limitations. (Tr. 204). He explained that she did not require hospitalizations, has consistently engaged in outpatient treatment, meets with her psychotherapist regularly, and is prescribed psychotropic medications. (Tr. 205). He wrote that her "ADLS are functional psychiatrically." (Tr. 205). On the PRTF, he opined that she had mild restrictions in activities of daily living, moderate restrictions in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation of extended duration. (Tr. 217).[1]

On January 25, 2011, Plaintiff's treatment plan at CFSS was updated. (Tr. 244). Her anxiety goal was to decrease days on which she felt anxiety from four days a week to two days a week. (Tr. 244). Notes indicated that Plaintiff "admits she gets anxious when she goes out of the house." (Tr. 244).  There had been "no change" in her anxiety goal. Her depression goal was to decrease the days she felt depressed from three to two times per week. (Tr. 244). Plaintiff had "improved" in this goal, and expressed she "really hasn't felt depressed since Christmas." (Tr. 244). Plaintiff had also "improved" in her goal of becoming more involved in the community and keeping herself occupied. (Tr. 244). She was assessed a GAF of 45. (Tr. 244).

---

[1] Plaintiff was originally scheduled for a consultative exam, but it was cancelled at the direction of the case agency after a note on October 27, 2010 that indicated "psych note: case completed. Dr. Suminski." (Tr. 202).

On May 10, 1011, Plaintiff's treatment plan at CFSS was updated. (Tr. 243). Her anxiety goal was to decrease the days on which she felt anxiety from two days a week to one day a week. (Tr. 243). She had "improved" in this goal. (Tr. 243). Her depression goal was to decrease the days on which she feels depressed from three to two days per week, and there had been "no change." (Tr. 243). Plaintiff "admit[ed] she has been having a hard time lately." (Tr. 243). Her goal of increasing her community involvement was no longer part of her treatment goals. (Tr. 243). She had a new goal to determine where she was going to move with her children for the next school year. (Tr. 243).

On August 1, 2011, Plaintiff was evaluated at CFSS. (Tr. 242). Her memory was intact, her insight and judgment were good, she was oriented, her thought process was logical and coherent, and her mood was appropriate. (Tr. 242). There were no adverse findings whatsoever. (Tr. 242). She was assessed a GAF of 40. (Tr. 242). On August 16, 2011, Plaintiff's treatment plan was updated. (Tr. 241). She had no change in her anxiety and depression goals. (Tr. 241). She had a new treatment goal, to take things one day at a time. (Tr. 241).

On October 12, 2011, Plaintiff appeared and testified at the ALJ hearing. (Tr. 9). She testified that she left her last job when she had to relocate to flee with her children from domestic violence. (Tr. 14). She testified that she sees three counselors, twice a month each. (Tr. 14-15). She testified that she takes a variety of medications, and that they were "working" and kept her "relaxed." (Tr. 15). However, she also testified that they make her drowsy and have slurred speech. (Tr. 15). She testified that, even on a "good day," her children get themselves ready for school and she does not get up until 11:00 a.m. (Tr. 16). She testified that she sometimes stays in bed for a week and only leaves the house to go to counseling. (Tr. 16). She testified that she cannot do routine grocery shopping, unless her children go with her at midnight. (Tr. 17). She

testified that she mostly prepares microwave meals and that her children help with the household chores. (Tr. 17). She testified that she had a mental breakdown when she moved to Pottsville two years earlier and had not improved with treatment. (Tr. 17). She testified that she spends most of her day on the couch watching television and that she was still living in the domestic violence shelter. (Tr. 19). She testified that she does not do anything with her children, like attend sports events or parent-teacher conferences. (Tr. 21). She testified that the frequent abuse in her life made it hard to get on her feet. (Tr. 23). She cried during the hearing. (Tr. 17).

Plaintiff's daughter submitted a letter to the ALJ at the hearing. She wrote that she had noticed Plaintiff "has not been happy in a long time" and "there are times when she stays in bed for days." (Tr. 147). She indicated that when Plaintiff is like that, she cares for her little  brother. (Tr. 147). She reported that her mother stays in the house all the time and never leaves except to go to counseling appointments. (Tr. 147). She also reported that she had gone to supermarkets with her mother and observed how "she gets easily irritated if there's too many people." (Tr. 148).  She also expressed pride in her mother's sobriety. (Tr. 148).

The vocational expert also appeared and testified. (Tr. 23). Given the ALJ's RFC assessment, as described below, the VE testified that Plaintiff could not perform past relevant work, but could do other work in the national economy in positions like an assembler of small products, stock checker, and price marker/tagger. (Tr. 24-26). The VE testified that if Plaintiff's testimony was fully credited, she would not be able to engage in any work. (Tr. 26-27).

The ALJ issued a decision on November 29, 2011. (Tr. 61). At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 17, 2010, the application date. (Tr. 54). At step two, the ALJ found that Plaintiff's attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, panic disorder with agoraphobia, post

traumatic stress disorder ("PTSD"), migraine headaches, and osteoarthritis were severe. (Tr. 54).
At step three, the ALJ found that Plaintiff did not meet or equal a listing.

The ALJ found that Plaintiff had the residual functional capacity to perform a range of
light work, sit or stand six out of eight hours of the day, walk up to one block at a time,
understand, remember and carry out simple instructions, and make simple work-related
decisions. (Tr. 56). The ALJ further found that she could respond appropriately to supervisors,
co-workers, usual work situations and changes in routine settings, but was restricted from
dealing directly with the public. (Tr. 56). At step four, the ALJ found that Plaintiff could not
engage in any past relevant work. (Tr. 56). At step five, the ALJ found that Plaintiff could
engage in other work in the national economy in positions like an assembler of small products,
stock checker, and price marker/tagger. (Tr. 60).

## VI.    Plaintiff Allegations of Error

### A.    The ALJ's Listing analysis

Plaintiff asserts that she meets Listing 12.04. (Pl. Brief at 6). Plaintiff describes her
diagnoses and symptoms, but not their functionally limiting effects. (Pl. Brief at 5-6). In order to
meet Listing 12.04, Plaintiff must not only demonstrate the threshold requirements, which she
discusses, but also either the "Paragraph B" criteria or "Paragraph C" criteria. The Listing states
that "[t]he required level of severity for these disorders is met when the requirements in both A
and B are satisfied, or when the requirements in C are satisfied." The B criteria require that
Plaintiff's impairments:

> B. Result[] in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration

Paragraph C requires:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

As Defendant correctly points out, Plaintiff did not argue that she satisfies these requirements. (Def. Brief at 15, n.4).

The ALJ considered the "Paragraph B" criteria. The ALJ adopted the opinion of the state agency physician and found that Plaintiff had a mild restriction in activities of daily living because she is able to shop at stores as long as she waits until midnight as long as she does not stay too long, does dishes, gets her children up for school, does laundry, cleans the house, and takes her children to appointments. (Tr. 55). The ALJ found that Plaintiff had only moderate difficulties in social functioning because she "stated she talks to family on the phone at least three times a week, she takes her children to their appointments and can use public transportation. She reported no problems with family, friends, and neighbors. She has no problems with authority figures and has never been fired from a job." (Tr. 55). The ALJ found that Plaintiff has only moderate difficulties with regard to concentration, persistence and pace because she can pay bills, count change, and use a checkbook, the Field Office Personnel indicated that Plaintiff had no difficulties with attention and concentration during the face-to-face interview, and Plaintiff's hearing testimony was logical, coherent, and without any apparent lapses in attention. (Tr. 55). The ALJ found that Plaintiff had experienced no episodes of decompensation. (Tr. 55).

Plaintiff does not challenge these findings, and a reasonable mind would accept these findings as adequate to conclude that Plaintiff does not meet a Listing. Thus, substantial evidence supports the ALJ's Listing analysis.

### B.     The ALJ's RFC assessment

Plaintiff asserts that the ALJ failed to properly evaluate the credibility of her symptoms and that his RFC assessment consequently lacks substantial evidence. Plaintiff argues that the ALJ failed to properly evaluate her credibility because 20 C.F.R. §416.929 and SSR 96-7p require an ALJ  to address "the intensity, persistence, and limiting effects of the alleged physical symptoms, treating physicians' medical opinion, prior work record, daily activities, and precipitating and aggravating factors." (Pl. Brief at 3). Plaintiff also asserts that 20 C.F.R. §416.929 and SSR 96-7p require an ALJ to "clearly state what allegations of subjective complaints exceeded the limitations outlined in the medical findings." (Pl. Brief at 3). Plaintiff further asserts that 20 C.F.R. §416.929 and SSR 96-7p  require an ALJ to "take into consideration the type, dosage, effectiveness and side effects of medication, as well as treatments other than medication." (Pl. Brief at 3).

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749 F.2d at 1071. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Carter,* 834 F.2d at 65; *Ferguson,* 765 F.2d at 37.

Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).   "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Also, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." Id. "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id.

The ALJ found that Plaintiff's complaints were less than credible because her treatment record did not corroborate the severity of her claims. (Tr. 57). He explained that, after her May 17, 2010 evaluation, "subsequent treatment records generally revealed the claimant's condition had improved" and her "treatment records reflect success with treatment." (Tr. 57, 59). The ALJ also cited to Plaintiff's treatment record, noting that she is only treated with counseling and medications, and has not required inpatient hospitalization or other intensive treatments. (Tr. 58). The ALJ stated that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 58).

The ALJ accurately characterized the record. Plaintiff improved with treatment at PCS. Plaintiff demonstrated either "moderate" or "good" progress since the last visit at every

appointment she had at PCS in 2008, including March 17, 2008, April 2, 2008, April 11, 2008,

April 17, 2008, April 24, 2008, June 19, 2008,  June 26, 2008, August 4, 2008, September 24,

2008, October 24, 2008, and November 13, 2008. (Tr. 314-15, 318-19, 321-22, 324-26, 328-29).

On the same dates, her capacity to respond and benefit from therapy was "good," "very good," or

"excellent." (Id.). Her discharge summary stated she was "doing well with treatment." (Tr. 311).

       She fled to escape domestic violence, but then improved again with treatment at CFSS.

On September 10, 2010, shortly after her application, her goals were to reduce anxiety and

depression days from four a week to two a week and to engage in her community more. (Tr.

176). By January 25, 2011, her depression had improved to only three days per week, so her new

goal was to decrease her depression from three days per week to two days per week. (Tr. 244).

She had "improved" with regard to engaging in her community. (Tr. 244). She reported that she

"really hasn't felt depressed" in over a month, since Christmas. (Tr. 244). By May 10, 2011, her

anxiety had decreased to only two days per week, and her new goal was to decrease her anxiety

from two days per week to one day per week. (Tr. 243). Her goal of engaging with the

community was no longer listed. (Tr. 243). At her evaluation on August 1, 2011, she had no

adverse findings whatsoever. (Tr. 242). Thus, in her course of treatment, Plaintiff decreased the

days on which she felt depression to only three per week and decreased the days on which she

felt anxiety to only two per week. Not only does this contradict her claim that she did not

improve with therapy, it also contradicts her claim that she experienced debilitating depression

and anxiety on a daily basis. An ALJ may rely on inconsistencies between a claimant's testimony

and record and conservative treatment to discount credibility. SSR 96-7p.

       Moreover, 20 C.F.R. 416.929 anf SSR 96-7p do not require the ALJ to itemize which

statements were found to be credible. Instead, they merely require a full consideration of all of

the evidence and that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Here, the ALJ wrote that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 58). This is sufficient specificity to allow the Court to review the credibility assessment.

Plaintiff argues that the ALJ's RFC assessment was also flawed because he failed to account for Plaintiff's claimed medication side effects. However, Plaintiff identified no objective medical evidence to support these side effects. The only evidence of the side effects was her testimony which, as described above, was properly found to be less than fully credible.

Plaintiff also cites to her removal from the EARN program. However, there is nothing in the record that specifies her job requirements in the EARN program, or whether it is relevant to the conclusion by the vocational expert, based on her RFC, that she could perform other work. For instance, her RFC precluded her from contact with the public. If the EARN program required contact with the public, her inability to work there would not relate to  ability to work in the jobs identified by the vocational expert that do not require interaction with the public. Thus, Plaintiff's removal from the EARN program, alone, does not damage the ALJ's credibility or RFC assessment. A reasonable mind could accept the relevant evidence as adequate to conclude that Plaintiff had the RFC to engage in a limited range of light work with the nonexertional limitations assessed by the ALJ. Thus, substantial evidence supports the ALJ's credibility assessment.

## VII.      Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 26, 2014 _____s/Gerald B. Cohn_____
GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE